**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WEE CARE NANNY AGENCY, LLC, | |
| **Plaintiff,** | **Civil Action No. 1:23-cv-02117-AT** |
| -against- | **DEMAND FOR JURY TRIAL** |
| WEECARE, Inc., | |
| **Defendant.** | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE*
MOTION FOR ENTRY OF TEMPORARY RESTRAINING ORDER AND
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Tony V. Pezzano (NY Bar # 2315547)
Matthew D. Asbell
Chintan A. Desai

OFFIT KURMAN, PA
590 Madison Avenue, 6th Floor
New York, NY 10022
Telephone: (212) 545-1900
Facsimile: (212) 545-1656
*Tony.Pezzano@offitkurman.com*
*Matthew.Asbell@offitkurman.com*
*Chintan.Desai@offitkurman.com*

Attorneys for Plaintiff Wee Care Nanny
Agency, LLC

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................... 1

II.  FACTUAL BACKGROUND ..................................................................................... 3

    A.   Plaintiff's Household Staffing Agency And Its Federally Registered WEE CARE NANNY Trademark .......... 3

    B.   Defendant Wrongfully And Willfully Expanded The Goods And Services For Its Nearly Identical WEECARE Mark To The Same Services As Plaintiff's WEE CARE NANNY Mark ........................... 5

    C.   Defendant's Wrongful Expansion Has Caused Immediate And Continuous Irreparable Harm To Plaintiff ........................................................................................................ 7

III. LEGAL STANDARD ............................................................................................. 14

IV.  ARGUMENT .......................................................................................................... 15

    A.   Plaintiff Will Suffer Immediate, Irreparable Harm Absent A TRO And PI ............ 15

    B.   Plaintiff Is Likely To Succeed On The Merits Of Its Claims ................................... 16

        1.  Plaintiff Is Likely To Establish The Validity Of Its WEE CARE NANNY Mark ........... 17

        2.  Plaintiff Is Likely To Establish That Defendant's Use Of The WEECARE Mark Is Likely To Cause Confusion As To Source And/Or Quality ................... 17

    a.   The First *Polaroid* Factor:  Plaintiff's WEE CARE NANNY Mark Is Strong ........................ 18

    b.   The Second *Polaroid* Factor:  Defendant's WEECARE Mark Is Nearly Identical To Plaintiff's WEE CARE NANNY Mark And Used For The Identical Services .......................... 19

    c.   The Third *Polaroid* Factor:  Defendant Has Expanded Use Of Its WEECARE Mark To The Identical Services Under Plaintiff's WEE CARE NANNY Brand ........................... 20

    d.   The Fourth *Polaroid* Factor: There Is No "Gap" To Bridge ................................... 21

    e.   The Fifth *Polaroid* Factor: There Is Evidence Of Actual Confusion ........................ 21

    f.   The Sixth *Polaroid* Factor:  Defendant Is Using Its WEECARE Mark In Bad Faith ................ 21

    g.   The Seventh *Polaroid* Factor:  Defendant's Use Of The WEECARE Mark Jeopardizes – Irreparably – The Good Will, Reputation And Continuance Of Plaintiff's WEE CARE NANNY Brand Business ................................................ 22

    h.   The Eighth *Polaroid* Factor:  The Families And Caregivers To Whom Plaintiff And Defendant Market Are Not Sophisticated Purchasers ........................ 23

    i.   The *Polaroid* Factors Strongly Favor Plaintiff ........................................ 23

C.   The Balance of Hardship Tips Decidedly In Plaintiff's Favor ..................................................... 24

D.   Issuing A TRO And PI Would Serve The Public Interest ......................................................... 24

E.   Plaintiff Should Not Be Required To Post A Bond .................................................................. 25

V.   CONCLUSION ................................................................................................................................. 25

# TABLE OF AUTHORITIES

Other Authorities

*3M Company v. Performance Supply, LLC,*
   458 F.Supp.3d 181 (S.D.N.Y. 2020)........................................................................................14, 19

*725 Eatery Corp. v. City of New York,*
   408 F.Supp.3d 424 (S.D.N.Y. 2019)................................................................................................16

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
   784 F.3d 887 (2d Cir. 2015)............................................................................................................14

*Christian Louboutin, S.A. v. Yves Saint Laurent America Holdings, Inc.,*
   696 F.3d 206 (2d Cir. 2012)............................................................................................................18

*Company v. Performance Supply LLC,*
   458 F.Supp.2d 181 (S.D.N.Y. 2020)..............................................................................................15

*Coty Inc. v. Excell Brands, LLC,*
   277 F.Supp.3d 425 (S.D.N.Y. 2017)..............................................................................................23

*Doctor's Associates, Inc. v. Stuart,*
   85 F.3d 975 (2d Cir. 1996)..............................................................................................................25

*Estate of Marilyn Monroe, LLC,*
   131 F.Supp.3d 196 (S.D.N.Y. 2015)..............................................................................................17

*Focus Products Group Int'l v. Kartri Sales Co., Inc.,*
   2022 WL 17851810 (S.D.N.Y. December 22, 2022) .....................................................................18

*Gucci America, Inc. v. Guess?, Inc.,*
   868 F.Supp.2d 207 (S.D.N.Y. 2012)..............................................................................................21

*Guthrie Healthcare System v. ContextMedia, Inc.,*
   826 F.3d 27 (2d Cir. 2016)...............................................................................................17, 20, 23

*Henegen Const. Co. Inc. v. Heneghan Contracting Corp.,*
   2002 WL 1300252 (S.D.N.Y. June 12, 2002)................................................................................23

*Heritage of Pride, Inc. v. Matinee of NYC,*
   2014 WL 12783866 (S.D.N.Y. June 20, 2014)..............................................................................22

*Lexington Mgmt. Corp. v. Lexington Capital Partners*,
   10 F.Supp.2d 271 (S.D.N.Y. 1998)..........................................................................................17, 18

*Long Island R. Co. v. Int'l Ass'n of Machinists,*
   874 F.2d 901 (2d Cir. 1989).....................................................................................................14, 16

*Luis Vuitton Malletier v. Sunny Merchandise,*
   97 F.Supp.3d 485 (S.D.N.Y. 2015)................................................................................................21

*Mahmood v. Nielsen,*
   312 F.Supp.3d 417 (S.D.N.Y. 2018)..............................................................................................14

*Malletier v. Burlington Coat Factory Warehouse Corp.,*
   426 F.3d 532 (2d Cir. 2005)............................................................................................................20

*Marks Org., Inc. v. Joles,*
   784 F.Supp.2d 322 (S.D.N.Y. 2011).........................................................................................15, 23

*Mister Softwee, Inc. v. Tsirkos,*
   2014 WL 2535114 (S.D.N.Y. June 5, 2014)..................................................................................21

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
   818 F.2d 254 (2d Cir. 1987)............................................................................................................21

*New York City Triathlon, LLC,*
    704 F.Supp.2d 305 (S.D.N.Y. 2010)................................................................15, 20, 22, 24
*NYP Holdings v. New York Post Pub. Inc.,*
    63 F.Supp.3d 328 (S.D.N.Y. 2014)................................................................................25
*Polaroid Corp. v. Polarad Elecs. Corp.,*
    287 F.2d 492 (2d Cir. 1961)..........................................................................................18
*Streetwise Maps, Inc. v. VanDam, Inc.,*
    159 F.3d 739 (2d Cir. 1998)..........................................................................................18
*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,*
    294 F.3d 383 (2d Cir. 2002)..........................................................................................19
*Virgin Enterprises Ltd. v. Nawab,*
    335 F.3d 141 (2d Cir. 2005)..........................................................................................20
*WpIX, Inc. v. Ivl, Inc.,*
    691 F.3d 275 (2d Cir. 2012)..........................................................................................24

Regulations

15 U.S.C. § 1114(1)..........................................................................................................2, 17
15 U.S.C. § 1125(a)..........................................................................................................2, 17
15 U.S.C. §1065................................................................................................................17
15 U.S.C. §1115(b)...........................................................................................................17
Section 32 and 43(a)(1)(A)...............................................................................................17

9

Federal Rule of Civil Procedure 65(c)..............................................................................25

Plaintiff Wee Care Nanny Agency, LLC ("Plaintiff"), by and through its undersigned counsel, respectfully submits this Memorandum of Law, and the concurrently filed Declarations of Marc Lenes, founder and owner of Plaintiff (the "Lenes Decl.") and Chintan A. Desai, Esq. of Offit Kurman ("Desai Decl."), in support of Plaintiff's *Ex Parte* Motion for Entry Of Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") against Defendant WeeCare, Inc. ("Defendant").  Pursuant to Local Civil Rule 7.1(a)(1), Plaintiff also submits concurrently herewith a Proposed Order to Show Cause.

## I.    <u>INTRODUCTION</u>

Plaintiff is a leader in the placement of nannies and babysitters for childcare and educators for children in the home in the New York Metropolitan area and surrounding regions.  For more than twenty (20) years, Plaintiff has operated as a trusted full-service household staffing agency, making placements in the homes of families only after undertaking an extensive background check, including for criminal background, of each and every nanny, babysitter and educator.  Plaintiff's nanny, babysitter and educator domestic placement services under the incontestable federally registered name WEE CARE NANNY are well-known in the New York Metropolitan region where Plaintiff operates and has garnered a significant amount of good will and recognition.

Defendant is knowingly and intentionally promoting, advertising, distributing, and using the nearly identical and confusingly similar WEECARE mark to Plaintiff's WEE CARE NANNY trademark within this district and throughout the United States in the exact same line of business – services for placing nannies and babysitters for childcare and educators for children in the home – as Plaintiff.   Despite being fully aware that Plaintiff is the owner of the WEE CARE NANNY Mark for services that provide placement of nannies and babysitters for childcare and educators for children in the home within the New York Metropolitan region, and after informing the U.S. Patent & Trademark

1

Office ("USPTO") that Defendant's WEECARE mark is not used as a source identifier for childcare services, Defendant recently deliberately expanded its use of the mark WEECARE to services for the placement of nannies and babysitters for childcare and educators for children in the home, willfully infringing upon Plaintiff's rights in and to the WEE CARE NANNY Mark.  Based on this evidence, Plaintiff's Complaint alleges claims for: (1) willful trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1), and New York common law; and (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), and New York common law.

Plaintiff has also obtained evidence clearly demonstrating the following:  (1) Plaintiff and Defendant have the same marketing and advertising channels through their respective internet websites (www.weecarenanny.com (Plaintiff) and www.weecare.co (Defendant)) and market to the same customers:  families, nannies and babysitters; (2) as a result of Defendant's use of the WEECARE mark, there is substantial confusion in the market by families, nannies and babysitters confusing Defendant's services for the placement of nannies and babysitters for childcare and educators for children in the home with the same services provided by Plaintiff; (3) the significant difference in the quality and safety of Plaintiff's nanny, babysitter and educator domestic household services which extensively background checks, including for criminal background, each and every nanny and babysitter before placing them with a family, and Defendant's inferior and unsafe service which does not perform this critically important step before connecting each and every nanny and babysitter with a family, coupled with the confusion in the market regarding whether Plaintiff or Defendant is the source of such services, has caused immediate and continuous irreparable harm to the reputation and goodwill of Plaintiff's business; (4) in view of the extensive number of nannies and babysitters, who have not been background checked, including for criminal background, that are listed on Defendant's website and invited to connect with families, immediate and irreparable injury will likely result to Plaintiff before a hearing in this action; and (5)

2

Defendant's placement of nannies and babysitters for childcare in the home without charging a fee for such services will **cause immediate and continuous irreparable harm to Plaintiff through** an erosion in its fees charged for placing nannies and babysitters.

Based on the foregoing, a TRO and PI are fully warranted. Absent injunctive relief, Plaintiff is likely to suffer reputational damage and loss of goodwill that would be impossible to quantify. Absent a TRO and PI preventing Defendant from infringing Plaintiff's WEE CARE NANNY trademark and unfairly competing with Plaintiff's nanny and babysitter domestic placement services under the name WEE CARE NANNY, Plaintiff will suffer immediate injury to the goodwill and business reputation that it has worked for decades to build, and erosion in its fees charged for placing nannies and babysitters. Plaintiff is also likely to succeed on the merits of its claims, including, in particular, its federal and state common law claims for trademark infringement and unfair competition, because Defendant is using the infringing WEECARE mark without authorization and endorsement from Plaintiff. Moreover, Defendant's inferior and unsafe services for childcare – about **90%** of the nannies and babysitters listed on Defendant's website for connection with families for childcare are not subject to criminal background checks, or any background check at all – are causing immediate harm to Plaintiff's goodwill and reputation and there will likely result in a childcare tragedy mistakenly attributed to Plaintiff causing harm to Plaintiff or even its shutdown. Accordingly, this Court should grant Plaintiff's *Ex Parte* Motion for a TRO and Motion for a PI that prohibits Defendant from such unlawful conduct for which Plaintiff has no adequate remedy at law.

## II.   FACTUAL BACKGROUND

### A.   Plaintiff's Household Staffing Agency And Its Federally Registered WEE CARE NANNY Trademark

The WEE CARE NANNY trademark has been in use in commerce with Plaintiff's full-

service household staffing agency that places nannies and babysitters for childcare and educators

for children in the home since at least as early as April 1, 2002. Since that time, Plaintiff has

continuously used the mark WEE CARE NANNY, and consumers have come to rely upon and

trust the WEE CARE NANNY brand as the source of only the highest quality and safety for placing

nannies and babysitters for childcare and educators for children in the home.  Lenes Decl. ¶ 4.

   In addition to its strong common law rights in the WEE CARE NANNY Mark, Plaintiff

owns the following U.S. Patent and Trademark Office ("USPTO") Registration No. 4,907,824,

registered March 1, 2016, for the standard character mark WEE CARE NANNY (Lenes Decl. ¶ 5;

Exh. A (Certificate of Registration and USPTO Trademark Status and Document Retrieval)):

| Mark | U.S. Reg. No. | Goods and Services | Status |
|------|---------------|--------------------|--------|
| WEE CARE NANNY | 4,907,824 | Int. Cl. 35 (U.S. Cls. 100,  101 and 102):  employment agency services, namely, filling the temporary and permanent staffing needs of businesses; employment agency services, namely, temporary and permanent placement of healthcare professionals; employment agency services, namely, temporary placement of child care providers; employment counseling and recruiting; employment counseling in the field(s) of household domestic staffing; employment staffing in the field of household domestics, namely, nannies, babysitters, baby nurses, companions, housekeepers, personal  assistants, domestic couples, house managers, valets and cooks; nanny placement agencies; nanny referral agency services; providing an employer with candidates or potential employees to fill temporary, contract and permanent positions; referrals in the field of household domestic staffing; temporary employment agencies | Registered |

   WEE CARE NANNY-branded services are offered and sold online and by telephone in the

New York Metropolitan region, with a substantial amount of such business within the 5 boroughs

of New York City and Connecticut. Plaintiff has derived substantial revenue from the sale of WEE

CARE NANNY-branded services.  Over the past 12 months, services under the WEE CARE

NANNY Mark have generated substantial revenue on a month by month basis.  Lenes Decl. ¶ 6.

Plaintiff also uses the WEE CARE NANNY Mark in advertising, marketing, and promotional materials in the New York Metropolitan region through various media. The success of Plaintiff's full-service household staffing agency that places nannies and babysitters for childcare and educators for children in the home is due, in part, to its extensive promotion and advertising for the WEE CARE NANNY Mark.  From March 2013 to date, Plaintiff has made a substantial dollar investment in marketing, advertising, seminars and training for the services under the WEE CARE NANNY Mark. Plaintiff's extensive advertising, marketing and promotional efforts have generated a significant amount of good will and consumer recognition in Plaintiff's WEE CARE NANNY Mark.  Lenes Decl. ¶ 7.

The WEE CARE NANNY Mark is recognized and well-known to nannies, babysitters, educators and families seeking childcare throughout the New York Metropolitan region.  Plaintiff has been the exclusive source of goods and services under the WEE CARE NANNY Mark for several decades.  As a result of Plaintiff's extensive use and advertising of goods and services bearing the WEE CARE NANNY Mark, consumers identify Plaintiff – and only Plaintiff – as the source of Plaintiff's trusted full-service household staffing agency. Lenes Decl. ¶ 8.

The WEE CARE NANNY Mark symbolizes an exceptional level of quality, reliability, trustworthiness and safety, crucial qualities in the employment agency industry for placing nannies and babysitters for childcare and educators for children in the home. The WEE CARE NANNY Mark is an asset of incalculable value for Plaintiff's services.  Lenes Decl. ¶ 9.

**B.    Defendant Wrongfully And Willfully Expanded The Goods And Services For Its Nearly Identical WEECARE Mark To The Same Services As Plaintiff's WEE CARE NANNY Mark**

Defendant does not have, nor has it ever had, the right or authority to use Plaintiff's WEE CARE NANNY Mark for any purpose, including for placing nannies and babysitters for childcare

and educators for children in the home. Lenes Decl. ¶ 10.  Despite Defendant's actual knowledge of Plaintiff's ownership of the WEE CARE NANNY Mark for services that provide nanny and babysitter staffing for childcare and educators for children in the home, and misinforming the USPTO that Defendant's WEECARE mark is not used as a source identifier for childcare services, Defendant recently deliberately expanded its use of the WEECARE mark to services for the placement of nannies and babysitters for childcare and educators for children in the home, willfully infringing upon Plaintiff's rights in and to the WEE CARE NANNY Mark.

In particular, Defendant owns U.S. Trademark Registration No. 5,730,827 of April 23, 2019 for WEECARE for "downloadable mobile applications for communication, video and photograph sharing between daycare service providers and parents or family members" in Class 9 and "software as a service (SAAS) services featuring software for daycare management and operations" in Class 42.  These goods and services are focused on institutional daycare service providers and customers, not domestic household services. Desai Decl. ¶ 3; Exh. B. During prosecution of Defendant's registration for WEECARE in the USPTO, Plaintiff's WEE CARE NANNY Mark was directly cited by the Examining Attorney against Defendant's WEECARE mark in the first Office Action dated January 22, 2018.  The Examining Attorney contended that Defendant's services were related to those of Plaintiff because "consulting firms also offer employment agency services."  In response to this citation, Defendant asserted that their mark WEECARE is "specifically used in relation to consulting and business advisement services, and is not used as a source identifier for childcare services, or employee management services."  Desai Decl. ¶ 4; Exh. C.  (Page 8 of Response to Office Action filed on July 19, 2018).

Thus, Defendant knew or should have known that Plaintiff was and is the owner of the WEE CARE NANNY Mark for services that provide nanny and babysitter staffing for childcare and educators for children in the home at least as early as January 22, 2018, when the first Office

Action issued refusing the application.  Despite knowledge of Plaintiff's WEE CARE NANNY

mark, and its assertion to the USPTO that Defendant's WEECARE mark is not used as a source

identifier for childcare services, Defendant more recently deliberately expanded its services to the

placement of nannies and babysitters for childcare and educators for children in the home, willfully

infringing upon Plaintiff's rights in and to the WEE CARE NANNY Mark.[1]

Furthermore, counsel for Plaintiff sent a demand letter of November 10, 2022 (Desai Decl.

¶ 5; Exh. D) to Ms. Jessica Chang, CEO of Defendant, providing notice of Plaintiff's incontestable,

federally registered WEE CARE NANNY Mark for nanny and/or babysitter domestic household

staffing services and requesting that Defendant immediately cease and desist their infringing use

of the WEECARE mark for the placement of nannies and babysitters for childcare and educators

for children in the home. Defendant never responded to this demand letter.   Nevertheless,

subsequent to this letter, Plaintiff's counsel and Plaintiff have attempted, without success, to

negotiate the immediate and permanent cease and desist of Defendant's use of the WEECARE

mark in connection with household staffing services.   Desai Decl. ¶ 6.   Notwithstanding the

foregoing notice and demand to cease and desist, Defendant's infringing use of the WEECARE

mark has continued.  Lenes Decl. ¶ 11.

### C.   Defendant's Wrongful Expansion Has Caused Immediate And Continuous Irreparable Harm To Plaintiff

Plaintiff and Defendant have the same marketing and advertising channels through their

respective internet websites:  www.weecarenanny.com (Plaintiff) (Lenes Decl. ¶ 12; Exh. E

(pertinent web pages) and www.weecare.co (Defendant) (Lenes Decl. ¶ 12; Exh. F (pertinent web

---

[1] Plaintiff's Ex Parte Motion for a TRO and Motion for a PI does not seek to enjoin Defendant's use of the WEECARE mark in connection with software for institutional day care service providers covered by Classes 9 and 42, but rather seeks to enjoin the improper expansion of Defendant's use of the WEECARE mark for placement of nannies and babysitters for childcare and educators for children in the home that infringes Plaintiff's WEE CARE NANNY Mark.

pages)**.**  Plaintiff and Defendant market to the same consumers:  families, nannies, babysitters and educators.  Lenes Decl. ¶ 13.  As a result of Defendant's use of the WEECARE mark, there has already been substantial confusion in the market by families and caregivers confusing Defendant's nanny and babysitter household childcare services with Plaintiff's nanny and babysitter household childcare services.   Lenes Decl. ¶ 14; Exh. G (16 representative samples of at least 40 known instances of actual confusion).[2]

There is a significant difference between the nanny and babysitter household childcare services provided by Plaintiff and Defendant that is vitally important regarding the quality and safety of the services they provide.  As explained in more detail below through a comparison of Plaintiff's and Defendant's websites, Plaintiff selects nannies and babysitters for families only after an extensive background check, including for criminal background, of each and every nanny or babysitter before the nanny or babysitter is directly connected to trial or work with each family.  In contrast, Defendant directly connects families with nannies and babysitters through their website regardless of whether a nanny or babysitter has been subject to a background check, including for criminal background.   Moreover, a substantial number of nannies and babysitters who Defendant encourages families to directly connect have not been subject to a background check, including for criminal background.  Lenes Decl. ¶ 15.

Defendant knows that background checks of nannies and babysitters for childcare in the home for infants (0-2) and toddlers (2-5 yrs and 5+ yrs) are vitally important, because it references these checks on its website, and deceptively suggests that it performs these checks on "every

---

[2] Moreover, actual confusion is increased because the subordinate term "NANNY" is often omitted from Plaintiff's mark, and Plaintiff is thus often referred to as "WEE CARE," including in Google reviews.  Families and caregivers often refer to Plaintiff as "WEE CARE" when calling or emailing.  Also, Plaintiff is promoted organically as "WEE CARE" by pleased past and current clients on social media sites like Facebook mom's groups.  *Id.*

candidate," when in fact a background check has not been performed on substantially all of the

nannies and babysitters listed on its website  (**Lenes Decl. ¶ 16; E**xh. F at 15-17):

> "How does WeeCare use background checks?
>
> We manually review every candidate whose history reveals information that may
> disqualify them from providing care. If the results of the background check confirm that a
> prospective provider does not meet our safety standards, the individual is immediately
> removed and banned from our platform. We look at a variety of charges when determining
> eligibility for our platform. Any of the following criminal convictions will disqualify a
> prospective provider from joining the platform, and will result in a current provider's
> immediate termination from the platform, including:
>
> - Criminal Intent
> - Security Charges
> - Theft & Property
> - Drugs & Alcohol
> - Sexual Charges
> - Vehicles & Traffic
> - Fraud & Deception
> - Statutory Charges
> - Violence & Homicide
>
> In accordance with federal and state privacy laws, WeeCare is unable to share specific
> results from an individual's background check, however we encourage families to select
> care providers with the verified WeeCare badge that signifies they have passed a
> background check. Families are also welcome and encouraged to conduct additional
> background checks at their discretion."

However, Defendant only asks its nannies and babysitters "to submit a 5 min background

check," **and** also advises nannies and babysitters:  "You don't need to get a background check

right away, however, your profile will not show up as verified.  Nannies and sitters who complete

background checks and are verified are 6x more likely to match with a family.  We are happy to

have you be part of our network.  But note that in the future, a parent may request for you to get

a background check."  **Lenes Decl. ¶ 17**; Exh. F at p. 20.

Defendant also knows that all of the nannies and babysitters available on its website for

selection by families are not background checked (**Lenes Decl. ¶ 18**; Exh. F at p. 16):

> "How do I know which providers are background checked?

Background checked providers earn their verification badge  . This badge appears next to their profile photo and on the provider's listing page."

A review of the 19 page list of the nannies (10 per page for a total of 190) on Defendant's website in New York City and its boroughs shows that only 24 of the 190 nannies have the verification badge check mark and are allegedly background checked, the remaining 166 nannies that are available for selection by families for care of their infants and toddlers are not verified (and thus not background checked).  Lenes Decl. ¶ 19; Exh. F at 21-114.

A review of the 70 page list of babysitters (10 per page, except last page is 9, for a total of 699) on Defendant's website in New York City and its boroughs shows that only 61 of the 699 babysitters have the verification badge check mark and are allegedly background checked, the remaining 638 babysitters that are available for selection by families for care of their infants and toddlers are not verified (and thus not background checked).  Lenes Decl. ¶ 20; Exh. F at 115-463.

Families searching for a nanny or babysitter for their infant or toddler can directly choose and hire any of the nannies or babysitters, with or without a background check, listed on Defendant's website.  Moreover, Defendant invites its registered nannies and babysitters, with and without a background check, to reach out directly to families in the New York Metropolitan area (Lenes Decl. ¶ 21; Exh. F at p. 465):

"How do I meet families in my area?

As a nanny, babysitter, or daycare provider using WeeCare, you'll be able to meet families once you've joined our platform. Once registered, you'll be able to connect with families in your area who are looking for childcare with your specific skills and qualifications. Finally, you can also reach out to families in your area directly through our platform and introduce yourself and describe your experience and your availability."

In contrast to Defendant's inferior and unsafe nanny and babysitter domestic household service, while Plaintiff offers nannies and babysitters for Nanny Care, Temporary Care and

Newborn Care Specialists, Plaintiff does not permit families to directly contact and select nannies and babysitters on their own through a list of nannies and babysitters. Lenes Decl. ¶ 22; Exh. E at 1-9. But rather, based on a job description, Plaintiff carefully and extensively background checks, including for criminal background, on each and every caregiver before placing a nanny or babysitter with a family for childcare (Lenes Decl. ¶ 23; Exh. E at 10-11):  "Placement Managers literally go through scores of candidates to whittle the pool down to a select few experienced and dedicated child care providers (we reject over 93% of those that apply). As a brick and mortar agency, we personally meet and vet all candidates. We speak with and authenticate their past child care references. Additionally, we conduct some of the most stringent background checks in the industry."  For the duration of the placement, Plaintiff follows-up with hiring families and placed nannies to provide ongoing support and guidance for any questions or issues that arise.

Notably, all nannies and babysitters have an extensive background check, including for criminal background, before they are placed with families (**Lenes Decl. ¶ 24**; Exh. E at 13-16):

"ALL CANDIDATES MUST BE:
At least 21-years of age

A US citizen or legally authorized to work in the U.S.

A nonsmoker in good health to meet the requirements of the position
ALL CANDIDATES MUST HAVE/PROVIDE:
At least two forms of valid identification. One form must be a state or federally issued photo ID

Proof of eligibility to work legally in the U.S.

Verifiable work references with names, addresses, contact numbers and timeframe employed

At least two years of recent professional nanny or domestic experience.

A willingness to make at least a one-year commitment (for permanent positions)

Written authorization for us to check work references, driving (DMV) records and conduct an extensive criminal background check

A valid U.S. driver's license (not required for all positions)"

11

The significant difference in the quality and safety of Plaintiff's nanny and babysitter domestic household services which extensively background checks, including for criminal background, each and every nanny and babysitter before placing them with a family, and Defendant's inferior and unsafe service which does not perform this critically important step before connecting each nanny and babysitter with a family, coupled with the confusion in the market regarding whether Plaintiff or Defendant is the source of such services, has caused immediate and continuous irreparable harm to the reputation and goodwill of Plaintiff's business.  Lenes Decl. ¶ 25.

Moreover, Defendant's service is an invitation to a tragedy (harm to an infant or toddler) based on the misconduct of a nanny or babysitter placed for domestic household babysitting services that has not been background checked, including for criminal background.  Anyone can apply for Defendant's service and be listed as a nanny or babysitter on Defendant's website with an embellished or fabricated background or past employment history as a nanny or babysitter. While some of those jobseekers are legitimate and well-intentioned, there is no filter for people with evil intentions, predators, or otherwise psychologically unstable people that could injure a child physically or mentally.  Should such a tragedy occur, the reputational damage could result in the closing of a nanny and babysitter domestic household service.  Lawmakers and regulators could take action to shut down the business  or potentially the entire on-line nanny and baby sitter domestic childcare business in at least the New York Metropolitan region.  Because of the confusion caused by Defendant's use of the infringing WEECARE mark, misconduct caused by a nanny or babysitter referred by Defendant's service could be wrongly attributed to Plaintiff's business, resulting in direct harm to Plaintiff or even its shutdown. Lenes Decl. ¶ 26.  For example, Plaintiff could be wrongly confused with a potential childcare tragedy with a headline referencing a "nanny or babysitter from Wee Care" or a "Wee Care nanny or babysitter" was arrested for a

12

crime.  There are examples of where such tragedies have caused a business to close or lose substantial market share. **Lenes Decl. ¶ 27; Exh. H.**  In view of the extensive number of nannies and babysitters who have not been background checked, including for criminal background, that are listed on Defendant's website and invited to connect with families, immediate and irreparable injury will result to Plaintiff before a hearing in this action.  **Lenes Decl. ¶ 28.**

In addition, families can select a nanny or babysitter on Defendant's website free of charge. In contrast, Plaintiff charges an agency fee based on a percentage of the total gross annual compensation paid to a Nanny Care babysitter or Newborn Care Specialist, or specific member (members pay a yearly fee of $249) and nonmember fees for Temporary Care babysitters depend on a number of factors, including length of time of service, holiday service, notice and emergency booking.   Families contemplating the hiring of a household caregiver are deceived by the free services of Defendant into believing that they should not have to pay an agency or that an agency such as Plaintiff is just a middle man, seeking to profit without providing any real value.  As a result, Defendant's placement of nannies and babysitters for childcare in the home without charging a fee for such services will **cause immediate and continuous irreparable harm to Plaintiff through** an erosion in its fees charged for placing nannies and babysitters.   Moreover, as a result of the ongoing confusion in the marketplace, each potential loss (known and unknown) of connecting with a hiring family or qualified nanny, babysitter or educator has and will continue to cost Plaintiff thousands of dollars in lost revenue.  An example of a recent loss is healthcare company BeneLynk headquartered in Milford, Connecticut close to Plaintiff's business.  BeneLynk announced its hiring of WeeCare "the largest childcare network in the United States, with the mission to provide access to affordable,       high-quality       childcare       to       all       families" (https://twitter.com/BeneLynk/status/1599914627798032384/photo/1).  Lenes Decl. ¶ 30; Exh. I).

13

### III.   **LEGAL STANDARD**

Plaintiff seeks a TRO and PI against Defendant's use of the WEECARE mark in the same line of business as WEE CARE NANNY for placement of nannies and babysitters for childcare and educators for children in the home.  "In the Second Circuit, the same legal standard governs the issuance of preliminary injunctions and [TROs]."  *3M Company v. Performance Supply, LLC,* 458 F.Supp.3d 181, 191 (S.D.N.Y. 2020), *quoting, Mahmood v. Nielsen,* 312 F.Supp.3d 417, 421 (S.D.N.Y. 2018).  To obtain either, Plaintiff must show:  "(1) a likelihood of success on the merits […]; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC,* 784 F.3d 887, 895 (2d Cir. 2015).  Of particular significance here and now, harm both to the parties within a lawsuit *and to the public* may be considered when determining if failure to issue a PI will result in irreparable harm.  *Long Island R. Co. v. Int'l Ass'n of Machinists,* 874 F.2d 901 (2d Cir. 1989) (PI prohibiting union from striking where the public would sustain irreparable harm).

For the reasons cited herein, Plaintiff is entitled to a TRO and PI, because: (1) Plaintiff is likely to succeed on the merits of its claims; (2) Plaintiff faces immediate irreparable harm in the absence of swift injunctive relief; (3) the balance of equities favors issuing the requested injunctive relief; and (4) entering the requested injunctive relief would serve the public interest in avoiding confusion about the source, quality and safety of the services at issue.  Notably, the unsafe childcare placement services offered by Defendant – about **90%** of the nannies and babysitters listed on Defendant's website for connection with families for childcare are not subject to criminal background checks, or any background check at all -- is causing immediate harm to Plaintiff's goodwill and reputation but also could result in a childcare tragedy mistakenly attributed to

Plaintiff causing harm to Plaintiff or even its shutdown.

## IV.    <u>ARGUMENT</u>

### A.    <u>Plaintiff Will Suffer Immediate, Irreparable Harm Absent A TRO And PI</u>

To show irreparable harm, the moving party need only show that "remedies available at law, such as monetary damages, are inadequate to compensate the plaintiff." *3M Company v. Performance Supply LLC,* 458 F.Supp.2d 181, 191 (S.D.N.Y. 2020), *quoting*, *Marks Org., Inc. v. Joles,* 784 F.Supp.2d 322, 334 (S.D.N.Y. 2011) (granting TRO and PI).

Here Defendant's conduct is likely to create immediate and continuing irreparable harm to the goodwill and reputation of Plaintiff's WEE CARE NANNY brand services for placement of nannies and  babysitters for childcare and educators for children in homes.   Plaintiff has obtained evidence establishing the significant difference in the quality and safety of Plaintiff's nanny and babysitter domestic household services, which extensively background checks, including criminal backgrounds, for each and every nanny and babysitter before placing them with a family, compared with Defendant's inferior and unsafe service which does not perform this critically important step for about **90%** of nannies and babysitters.   Coupled with the confusion in the market regarding whether Plaintiff or Defendant is the source of such services, the extremely inferior and unsafe procedure of Defendant's placement services has caused immediate and continuous irreparable harm to the reputation and goodwill of Plaintiff's business.   This constitutes textbook irreparable harm. *See, e.g., New York City Triathlon, LLC,* 704 F.Supp.2d 305, 325 (S.D.N.Y. 2010) ("It is well settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard.").

Moreover, because Defendant's inferior and unsafe service does not perform a pre-placement criminal background check, or any background check at all, for about 90% of the

nannies and babysitters listed on its website and invited to connect to families, Defendant's service is an invitation to a tragedy (harm to an infant or toddler). While some of those nannies or babysitters are legitimate and well-intentioned, there is no filter for people with evil intentions, predators, or otherwise psychologically unstable people that could injure a child physically or mentally. *See Long Island R. Co.,* 874 F.2d 901 (2d Cir. 1989) (harm to general public considered). Should such a tragedy occur, this could result in the closing of a nanny and babysitter domestic household service or potentially the entire on-line nanny and baby sitter domestic industry in at least the Metropolitan region.  Because of the confusion caused by Defendant's use of the infringing WEECARE mark, misconduct caused by a nanny or babysitter referred by Defendant's service could be wrongly attributed to Plaintiff's business, resulting in direct harm to Plaintiff or even its shutdown.  Lenes Decl. ¶ 26.  In view of the extensive number of nannies and babysitters, who have not been background checked, including for criminal background, that are listed on Defendant's website and invited to connect with families, immediate and irreparable injury will result to Plaintiff before a hearing in this action.

Defendant's placement of nannies and babysitters for childcare in the home without charging a fee for such services will **likely cause immediate and continuous irreparable harm to Plaintiff through** an erosion in its fees charged for placing nannies and babysitters.  **Lenes Decl. ¶ 29. Moreover,** as a result of the ongoing confusion in the marketplace, each potential loss (known and unknown) of connecting with a hiring family or qualified nanny, babysitter or educator has and will continue to cost Plaintiff thousands of dollars in lost revenue. **Lenes Decl. ¶ 30; Exh. I.**

### B.      Plaintiff Is Likely To Succeed On The Merits Of Its Claims

To obtain a TRO and PI, Plaintiff must establish a likelihood of success on the merits of only one of its claims. *See 725 Eatery Corp. v. City of New York,* 408 F.Supp.3d 424, 459

(S.D.N.Y. 2019).  Nonetheless, because the same standard governs Plaintiff's claims for trademark infringement and unfair competition under 15 U.S.C. §1114(1) and 15 U.S.C. §1125(a) (Counts I and II of the Complaint) and under New York Common Law (Counts III and IV of the Complaint), Plaintiff analyzes these Claims together for purposes of this Motion.

For Plaintiff to prevail on its Claims, it must satisfy two elements, namely:  (1) that its WEE CARE NANNY Mark is valid and entitled to protection; and (2) Defendant is using the nearly identical WEECARE Mark in a manner that is likely to create consumer confusion.  *See Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F.Supp.2d 271, 277 (S.D.N.Y. 1998) (applying the same standard to Section 32 and 43(a)(1)(A) claims; granting PI); *Avela, Inc. v. Estate of Marilyn Monroe, LLC,* 131 F.Supp.3d 196, 209 (S.D.N.Y. 2015).

### 1.   Plaintiff Is Likely To Establish The Validity Of Its WEE CARE NANNY Mark

Plaintiff's incontestable U.S. Trademark Registration No. 4,907,824 for WEE CARE NANNY constitutes *conclusive* evidence of, *inter alia*, the validity of the WEE CARE NANNY Mark, Plaintiff's ownership of the mark, and Plaintiff's exclusive right to use the WEE CARE NANNY Mark in commerce in connection with the identified services.  *See* 15 U.S.C. §1115(b); *accord* 15 U.S.C. §1065; *Lexington Mgmt. Corp.,* 10 F.Supp.2d at 277-78.   Accordingly, Plaintiff is likely to establish the first element of its Claims.

### 2.   Plaintiff Is Likely To Establish That Defendant's Use Of The WEECARE Mark Is Likely To Cause Confusion As To Source And/Or Quality

"The likelihood-of-confusion prong turns on whether ordinary consumers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of [the junior user's] mark."  *Guthrie Healthcare System v. ContextMedia, Inc.,* 826 F.3d 27, 37 (2d Cir. 2016).  To determine whether a likelihood of confusion exists, courts in this

Circuit use the eight "*Polaroid*" factors, namely:  "1) the strength of the plaintiff's mark; 2) the

degree of similarity between marks; 3) the proximity of the products or services; 4) the likelihood

that the senior user will 'bridge the gap' into the junior user's product or service line; 5) evidence

of actual confusion between the marks; 6) whether the defendant adopted the mark in good faith;

7) the quality of defendant's products or services; and 8) the sophistication of the parties'

customers."  *Lexington Mgmt. Corp.,* 10 F.Supp.2d at 278 (referencing *Polaroid Corp. v. Polarad

Elecs. Corp.,* 287 F.2d 492 (2d Cir. 1961)).  As demonstrated herein, Plaintiff is likely to establish

that the balance of relevant *Polaroid* factors weighs overwhelmingly in its favor.

### a.   The First *Polaroid* Factor:  Plaintiff's WEE CARE NANNY Mark Is Strong

"The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to

identify goods sold under it as coming from one particular source."  *Streetwise Maps, Inc. v.

VanDam, Inc.,* 159 F.3d 739, 743 (2d Cir. 1998).  Courts measure a mark's distinctiveness in two

ways, namely:  (i) conceptual strength (*i.e.*, "inherent distinctiveness"), and (ii) commercial

strength (*i.e*., "acquired distinctiveness").  *See Streetwise Maps, Inc.,* 159 F.3d at 743-44.  Here,

the Plaintiff's WEE CARE NANNY Mark is inherently distinctive and is commercially strong

because it has acquired secondary meaning. *See Christian Louboutin, S.A. v. Yves Saint Laurent

America Holdings, Inc.,* 696 F.3d 206, 216 (2d Cir. 2012)  (a mark is commercially strong if it has

acquired "secondary meaning," *i.e.*, "in the minds of the public, the primary significance of [the

mark] […] is to identify the source of the product rather than the product itself.").

First, because the WEE CARE NANNY Mark has been federally registered since March

1, 2016, it is presumptively not descriptive.  *Focus Products Group Int'l v. Kartri Sales Co., Inc.,*

2022 WL 17851810, *29 (S.D.N.Y. December 22, 2022).  Moreover, the WEE CARE NANNY

Mark is suggestive of the services at issue, *i.e.*, placement of nannies and babysitters for childcare and educators for children in the home.  A suggestive mark is inherently distinctive.  *Id.* at 27.

Second, the WEE CARE NANNY Mark has acquired secondary meaning as a matter of law because, as discussed above, the WEE CARE NANNY Mark is incontestable.  *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 294 F.3d 383, 391 (2d Cir. 2002) ("Because FSLC continually maintained its registration of the mark, FSLC's mark is incontestable and, as a matter of law, it has acquired secondary meaning.").  Moreover, even in the absence of Plaintiff's incontestable registration, it is likely to establish that its  WEE CARE NANNY Mark has acquired secondary meaning.  As discussed above, Plaintiff has expended substantial dollars in advertising, marketing, and promoting its services under the WEE CARE NANNY Mark; such services under the WEE CARE NANNY Mark generate substantial revenue on a monthly basis; the WEE CARE NANNY Mark is recognized and well-known to nannies, babysitters, educators and households seeking childcare and educators for their children throughout the New York Metropolitan region; and Plaintiff has been the exclusive source of services under the WEE CARE NANNY Mark for several decades.  Lenes Decl. ¶ 4.  Several courts have held that the foregoing establishes the commercial strength of Plaintiff's WEE CARE NANNY Mark.  *See, e.g., 3M Co. v. Performance Supply, LLC,* 458 F.Supp.3d 181, 194 (S.D.N.Y. 2020).  Based on the foregoing, the first *Polaroid* factor favors Plaintiff.

      **b.**    **The Second *Polaroid* Factor:  Defendant's WEECARE Mark Is Nearly Identical To Plaintiff's WEE CARE NANNY Mark And Used For The Identical Services**

The similarity between Defendant's WEECARE Mark and Plaintiff's WEE CARE NANNY Mark is obvious.  The marks are identical except for the additional subordinate word NANNY in Plaintiff's WEE CARE NANNY Mark.  Moreover, the marks are used for the same

services, *i.e.*, placement of nannies and babysitters for childcare and educators for children in the home.   When assessing the similarity of two marks, courts "analyze the mark[s'] overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers."   *Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 537 (2d Cir. 2005).   Moreover, the additional subordinate word NANNY to WEE CARE does little to dispel actual confusion, and in fact enhances the likelihood that consumers will assume an affiliation or sponsorship.   Thus, this factor also weighs in favor of likely confusion.   *See New York City Triathlon v. NYC Triathlon Club,* 704 F.Supp.2d 305, 317 (S.D.N.Y. 2010) (the addition of the "subordinate" word "Club" to the NYC Triathlon mark does little to dispel likely confusion with the NYC TRIATHLON marks).

### c.   The Third *Polaroid* Factor:  Defendant Has Expanded Use Of Its WEECARE Mark To The Identical Services Under Plaintiff's WEE CARE NANNY Brand

Under the third *Polaroid* factor, courts consider "the subject matter of the commerce in which the two parties engage […]."   *Guthrie Healthcare System v. ContextMedia, Inc.,* 826 F.3d 27, 39 (2d Cir. 2016) (likelihood of confusion because, *inter alia*, both parties provide healthcare-related goods and services).   Here, as discussed above, Defendant expanded its services into the same services as Plaintiff's WEE CARE NANNY brand*, i.e.*, placement of nannies and babysitters for childcare and educators for children in the home.   Defendant's offering of the same services as Plaintiff under the infringing WEECARE mark heightens the likelihood that consumers will confuse the source of Defendant's services as originating from Plaintiff.   *See Virgin Enterprises Ltd. v. Nawab,* 335 F.3d 141, 150 (2d Cir. 2005) ("[T]he closer the secondary users goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source.").   Accordingly, the third *Polaroid* factor favors Plaintiff.

**d.    The Fourth *Polaroid* Factor: There Is No "Gap" To Bridge**

The fourth *Polaroid* "factor addresses the question of whether the two companies are likely to compete directly in the same market." *Gucci America, Inc. v. Guess?, Inc.,* 868 F.Supp.2d 207, 239-40 (S.D.N.Y. 2012).   When, as here, the parties' services are the same, they target the same customers (nannies, babysitters and educators), they advertise their services using the same marketing channel, the Internet, and in the same geographical distribution area, the New York Metropolitan region (Lenes Decl. ¶¶ 12-13), they compete directly in the same market.   Thus, this *Polaroid* factor is irrelevant because there is no gap to fill.  *See, e.g., Mister Softwee, Inc. v. Tsirkos,* 2014 WL 2535114, *5 (S.D.N.Y. June 5, 2014) (issuing PI; fourth *Polaroid* factor irrelevant where both parties sold ice cream).

**e.    The Fifth *Polaroid* Factor: There Is Evidence Of Actual Confusion**

Here, there is substantial evidence of actual confusion.   There are more than 40 documented instances where nannies and baby sitters have mistaken Defendant's WEECARE services for placement of nannies and babysitters for childcare in the home to be Plaintiff's WEE CARE NANNY services, including many instances where customers believed Plaintiff's website was Defendant's www.weecare.co website.   Lenes Decl. ¶ 14; Exh. G (16 representative examples of confusion).   Accordingly, the fifth *Polaroid* factor favors Plaintiff.  *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259 (2d Cir. 1987) ("The existence of some evidence of actual confusion, the fifth *Polaroid* factor, further buttresses the finding of a likelihood of confusion.").

**f.    The Sixth *Polaroid* Factor:  Defendant Is Using Its WEECARE Mark In Bad Faith**

"A defendant's good faith – or lack thereof – in adopting its mark is highly consequential among the *Polaroid* factors."  *Luis Vuitton Malletier v. Sunny Merchandise,* 97 F.Supp.3d 485,496 (S.D.N.Y. 2015).   To be sure, "where the second-comer has adopted its mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement.   Courts have

21

found a presumption of likelihood of confusion in such circumstances." *Id.*  Moreover, "actual or constructive knowledge" of the prior user's mark may indicate an absence of good faith or bad faith.  *See also Heritage of Pride, Inc. v. Matinee of NYC,* 2014 WL 12783866, *11 (S.D.N.Y. June 20, 2014).  Here, Defendant is guilty of both.

Despite being fully aware that Plaintiff was and is the owner of the WEE CARE NANNY Mark for services that provide nanny and babysitter staffing for childcare in the home within the New York Metropolitan region, and after informing the U.S. Patent & Trademark Office that Defendant's WEECARE mark is not used as a source identifier for childcare services, Defendant recently deliberately expanded its use of the mark WEECARE to services for the placement of nannies and babysitters for childcare and educators for children in the home, willfully infringing upon Plaintiff's rights in and to the WEE CARE NANNY Mark.  Moreover, Defendant has ignored Plaintiff's cease and desist letter and continued to infringe.  Lenes Decl. ¶ 11.  These facts establish bad faith, and thus, the sixth *Polaroid* factor favors Plaintiff.  *New York City Triathlon,* 704 F.Supp.2d at 319 (""there is no question that Defendant was aware of Plaintiff's marks and it is evident that Defendant's clear intention was and is to capitalize on Plaintiffs reputation and goodwill….  This intent is made further evident by Defendant's failure to respond to Plaintiff's cease and desist letter.").

> **g.  The Seventh *Polaroid* Factor:   Defendant's Use Of The WEECARE Mark Jeopardizes – Irreparably – The Good Will, Reputation And Continuance Of Plaintiff's WEE CARE NANNY Brand Business**

The seventh *Polaroid* factor concerns "whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Louis Vuitton Malletier,* 97 F.Supp.3d at 497-98.  As discussed *supra* at 7-13, 15-16 this is precisely what has happened here.  The inferior quality and unsafe procedure of Defendant's service which does not

perform the critically important step of performing an extensive background check, including for criminal background, before connecting each and every nanny and babysitter with a family has and will continue to jeopardize – irreparably -- the good will, reputation and continuance of Plaintiff's WEE CARE NANNY brand business as a result of the confusion in the market caused by Defendant's use of the WEECARE mark.  Thus, the seventh *Polaroid* factor favors Plaintiff. *See Henegen Const. Co. Inc. v. Heneghan Contracting Corp.,* 2002 WL 1300252, at *8 (S.D.N.Y. June 12, 2002) ("The fact that the plaintiff has maintained high-quality services for so many years makes it more likely that it would be damaged if its reputation were placed beyond its control").

> **h.    The Eighth *Polaroid* Factor:  The Families And Caregivers To Whom Plaintiff And Defendant Market Are Not <u>Sophisticated Purchasers</u>**

The eighth and final *Polaroid* factor concerns "the sophistication of the consumers and the degree of care likely to be exercised in purchasing the product."  *Coty Inc. v. Excell Brands, LLC,* 277 F.Supp.3d 425, 456 (S.D.N.Y. 2017).   Families and caregivers to whom Plaintiff and Defendant market their services are analogous to consumers of common household products "who are not sophisticated consumers for purposes of the *Polaroid* test." *Marks Organization, Inc. v. Joles,* 784 F.Supp.2d 322, 331 (S.D.N.Y. 2011).  However, in all fairness, an argument can be made that such families searching for nannies and babysitters for the childcare of their infants and toddlers are extremely careful and sophisticated purchasers.  Even if this were the case, the evidence that actual confusion has occurred among such purchasers demonstrates that confusion is possible even among more sophisticated consumers.  Thus, this factor is neutral.  *Id.* at 332.

> **i.    The *Polaroid* <u>Factors Strongly Favor Plaintiff</u>**

In sum, six of the eight *Polaroid* Factors strongly favor Plaintiff, and two are at best neutral. This "powerful showing of a likelihood of confusion" (*Guthrie Healthcare Sys.,* 826 F.3d at 46),

combined with the overwhelming strength and validity of Plaintiff's WEE CARE NANNY Mark, the immediate and continuing irreparable harm to Plaintiff's business, the real threat of irreparable harm to the public and Defendant's bad faith, establish a likelihood of success on the merits of Plaintiff's trademark infringement and unfair competition claims.

### C.    The Balance of Hardship Tips Decidedly In Plaintiff's Favor

Plaintiff has expended substantial time, money, and other resources to develop the quality, reputation, and goodwill associated with the WEE CARE NANNY Mark.  *See* Lenes Decl. ¶ 31. Should Defendant be permitted to continue their infringement, Plaintiff will suffer losses and damage to its reputation and good will and potentially its entire business.  *Id.* at ¶ 32.  Furthermore, Plaintiff is not seeking to enjoin Defendant's use of the WEECARE mark in connection with software for institutional day care service providers, but only Defendant's infringing use of  the WEECARE mark for placement of nannies and babysitters for childcare and educators for children in the home.  Thus, Defendant will therefore suffer no legitimate hardship in the event a TRO and PI are issued because Defendant has no right to engage in its present infringement activities. *See WpIX, Inc. v. Ivl, Inc.,* 691 F.3d 275, 287 (2d Cir. 2012) ("It is axiomatic that an infringer […] cannot complain about the loss of ability to offer its infringing products"); *New York City Triathlon Club, LLC,* 704 F.Supp.2d at 344 (Balance of hardships favored plaintiff entering PI that did "not prohibit Defendant from operating a training club [in general].  It only prohib[ited] Defendant from operating a training club using the same name that infringes upon Plaintiff's Marks.") .

### D.    Issuing A TRO And PI Would Serve The Public Interest

Defendant is engaged in infringing activities and is directly defrauding the consuming public by palming off Defendant's services as Plaintiff's services for the placement of nannies and babysitters for childcare and educators for children in the home.  The public has an interest in not

being misled as to the origin, source, or sponsorship of trademarked services. *See NYP Holdings v. New York Post Pub. Inc.*, 63 F.Supp.3d 328, 342 (S.D.N.Y. 2014) (consumers have a "protectable interest in being free from confusion, deception and mistake."). Furthermore, the public interest is protected by issuing an injunction, because Defendant's inferior and unsafe service in which about **90%** of the nannies and babysitters listed on Defendant's website for connection with families are not subject to criminal background checks, or any background check at all, will be enjoined.

### E.     Plaintiff Should Not Be Required To Post A Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Courts have wide discretion in setting the amount of the bond and may dispense with the posting of a bond entirely where the parties sought to be restrained or enjoined "have not shown that they will likely suffer harm absent the posting of a bond." *Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996).  Here, Defendant asserts that it is not charging a fee for its placement services for nannies and babysitters for childcare in the home, and therefore, should not suffer any harm resulting from an improvidently granted injunction. Furthermore, no one, and especially not Defendant, will suffer any harm if the Court grants the requested TRO and PI and stops Defendant's deceptive and infringing activities.

## V.     CONCLUSION

In view of the foregoing, Plaintiff respectfully requests this Court grant its *ex parte* motion and enter a TRO as to Defendant in the form submitted herewith and schedule a hearing on Plaintiff's Motion for a PI before the expiration of the TRO.

Date:   March 14, 2023          Respectfully submitted by,

                                      */s/ Tony Pezzano*
                                      Tony V. Pezzano (NY Bar # 2315547)
                                      Matthew D. Asbell
                                      Chintan A. Desai

                                      OFFIT KURMAN, PA
                                      590 Madison Avenue, 6th Floor
                                      New York, NY 10022
                                      Telephone: (212) 545-1900
                                      Facsimile: (212) 545-1656
                                      *Tony.Pezzano@offitkurman.com*
                                      *Matthew.Asbell@offitkurman.com*
                                      *Chintan.Desai@offitkurman.com*

                                      Attorneys for Plaintiff Wee Care Nanny Agency, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system upon all registered counsel of record.

*/s/ Tony V. Pezzano*

Tony V. Pezzano (NY Bar # 2315547)